Good morning. I'm Judge Gould and I'm pleased to be sitting with Judge Camby and Judge Bea. We welcome all of you and thank you for coming to assist us on these cases. The first case that we have scheduled is I think it's United States v. Manzo-Jurado. And for appellant, we have David Ness. David Ness. David Ness, okay. Judge Camby, could you shut that? Could you push that paper there a little closer? This one? Yes, it's too far for me to read. Thank you. Okay, and for appellee, we have Elizabeth Horstman on video. Can you hear us? Yes, I can. Can you hear me, please? Yes, we can and we can see you perfectly. So we're all set. We've got this case set for ten minutes per side. So, Mr. Ness, if you'd like rebuttal or argument, please stop short of using up the full ten minutes. Sure. Thank you, Your Honors. As indicated, my name is David Ness. I'm with the Federal Defenders of Montana and I represent Sergio Manzo-Jurado. Mr. Manzo-Jurado was stopped and ultimately arrested at a football game in Haber, Montana. The articulated reasons for the stop and his ultimate arrest was essentially that he was Hispanic, that he spoke Spanish, that he was with a group of men without children, and that he did not appear to know others at the football game. Now, from that, the police officers derived an inference that he was on a work crew and that perhaps he and his five other friends were aliens. Now, perhaps they could draw a valid inference that these men were on a work crew and perhaps they could derive an inference that some of these men were aliens, but there was actually no evidence to suggest that these men or any of them were illegal aliens. Nevertheless, what they endeavored to do was, after the football game, to follow them outside to stop their vehicle to demand to see their papers. And in doing so, they found out that Mr. Manzo-Jurado was in the country illegally. About a week later, after his arrest, they did what they called a routine search of his employment records and discovered that he had an illegal Social Security card, and that is the charge with which he was ultimately charged and pled guilty to. Now, the district court found not only that the police were justified in their actions in stopping and arresting Mr. Manzo-Jurado, but it also found that they were justified not only constitutionally, but also under Section 1357A1 of Title VIII. And essentially what the district court did was, as I understand this ruling, was determine that that statute gave the police authority over and above the Fourth Amendment. You know, to get to the cut to the chase, I think the precedent, at least as I see it, is clear that there has to be reasonable suspicion. Correct. And the judge's opinion seems to me deficient in his explanation. However, it's not clear that there definitely isn't grounds for reasonable suspicion. You've got an argument there isn't. The government has an argument there is. The government agrees that there has to be reasonable suspicion. So I think it would really help me if you'd address your argument to the factors that go to that. Well, as Judge Gould has been aware, reasonable suspicion basically has to be based upon something other than a hunch. It has to be based upon specific articulable facts. Specific in that, as I understand the case law, they have to be specific to the person who was searched, searched, stopped, or arrested. And they can't be based upon mere racial considerations. And they have to point towards some sort of illegal activity. Now, on the racial issue, at least as I understand what the Supreme Court did in Brignone-Todds, they said that race or ancestry could be considered as one factor, but not the sole factor. That was a 1975 term case involving stopping Hispanics in a car near the border of Mexico. So race could be considered as one factor, I suppose. If you look at the other factors here that the court used, that they were single men, that they didn't appear to have children, that they weren't cheering enthusiastically for any other team, that the police didn't happen to know them from around this community, none of those factors point towards any sort of illegal activity. It points towards the fact, certainly, that these men are Hispanic, that they don't speak English, and that they may not know people around the community, and maybe that they're not enthusiastic football fans, but that none of those factors point towards any sort of illegality. And I don't think that the government necessarily said that, except that what they said is that they could derive an inference that these six men were on a work crew. And from that, they derived this large generalization that work crews often have aliens, and sometimes some of those aliens are illegal. And that's what I understood the government's argument to be and what the district court seemed to buy. And based upon that suspicion, that hunch, they argued, and the court seemed to buy, that they could go out and stop these men and ask them for their papers. And when you boil it down, really what it comes to, I think, here- Pardon me, counsel. Can't a border patrol officer go up to anybody and ask them, are you legally admitted in this country? I don't think that the- Without stopping them. Just saying, pardon me, sir, are you legally admitted in this country? The person can say, am I arrested? Am I detained? No. Walk away. Right? Sure. Isn't a threshold question here whether Mr. Manzo Jurado was actually detained by the officer? The vehicle was detained because they took out the keys. But when he approached the car and he said, let me see your hands at all times, that's a valid security request, is it not? Well, if you look at what happened- But is it a detention? I think it is a- Why can't Mr. Jurado simply show his hands, open the car door, walk out, and keep walking? Well, there were two police officers that came up to the car, the FBI agent on the passenger side and the border patrol agent on Mr. Manzo Jurado's side. They knocked on the window. He said that he was from Border Patrol. He announced it in Spanish. And he asked to see their papers. That's fine. Perfect. Okay. Up to that point, you've done nothing wrong. Well, except then the question- He hasn't detained them, has he? Well, but I think the question arises is would a reasonable person feel free to walk away under those circumstances? And I don't think under these circumstances that a reasonable person would. Do we have any cases that say that when a Border Patrol agent inquires regarding the papers of a suspect, that is a detention? I would agree that if a Border Patrol agent is walking down the street- We don't have any cases. Do we have any cases that say when he asks, show me your hands, that is a detention? I can't cite a specific case that says that. So up to this point, we don't have any authority telling us what, quote, would think under those circumstances. And we have to determine that ourselves. Is that correct? Yes, I think it's ultimately up to the court to make that decision. The Supreme Court in I think it's the Mueller case not too long ago said that merely asking a question of someone isn't a search. I'm fairly certain. They said an inquiry about papers or whether someone was an alien wasn't going to be viewed as a search. But that case, I think, did not involve any issue of whether the person had been seized or detained. Right. So are you familiar with that with that case? Safely familiar. I would just to confirm that the distinction between what the Supreme Court said there and this case, if it if it's controlling, is that the person was in the car and the officer turned the keys off and said, show me your hands. That's that's certainly one of the factors that distinguishes this case. Right. And also, don't forget that the FBI agent actually had his gun pulled. Now, only one of the occupants of the car saw that. But nevertheless, when the FBI agent came up behind the vehicle, he actually pulled out his gun and was armed at the time. Well, is that relevant if Monzo, if appellate Monzo Jurado didn't see the gun? Well, at least one of the occupants did, in fact, see the gun. And I think that it can certainly be used as a factor in this Court's inquiry in determining whether or not there was, in fact, a stop here. Judge Canby, I'm sorry. No, that was my question as to whether who saw the gun. I think it was Mr. Ponia. I have 40 seconds left. I think I'll respond. We'll add a couple of minutes on your rebuttal. Thank you. I'm sorry, Judge, I didn't hear you. I said we'll add two minutes for you for rebuttal right here. Any further questions? Your time was for questions. Okay. You've got it. Okay. Ms. Horstman, please proceed. Thank you. As the Court has heard, the defendant or the appellant is focusing on the fact of Hispanic appearance, when, in fact, the record is very clear and the district court found very clearly that there were many other factors at play. In terms of the reasonableness of the Border Patrol agent in approaching this group of six Hispanic men at a State of Montana high school state championship game on a cold November day in Montana in a rural town in central Montana. Pardon me, Ms. Horstman. He had six men appear to him. Ms. Horstman, may I ask you a question? Are you conceding for the purposes of this appeal that there was a detention because a reasonable person in Manso Jurado's situation would consider himself detained by the actions of the Border Patrol in turning off the car, taking the keys out, and saying, keep your hands in view? Are you conceding that a detention did, in fact, occur, a seizure occurred? That, yes, there was a detention when the automobile was turned off. And, Your Honor, primarily because the driver was actually the defendant in this matter. In any event, the circumstances were that a police officer first saw the defendant in a group of six men, that the police officer informed the Border Patrol, both in terms of the haversation as well as a Border Patrol agent that happened to be off duty and in the crowd. As the court found, and I would point out that the court did make 11 pages in the hearing transcript of findings of facts specific to the matters in this appeal, and many of those pages are specific to the reasonableness of the Border Patrol agent in walking up to the group outside of the game. After the initial group had been seen, the Border Patrol responded in both the un-uniformed officer in terms of collecting additional information by standing near the group. A uniformed Border Patrol officer actually came into the game, at which time two of the six men left. Then the officer, the plainclothes officer, was behind the group, heard them speaking in Spanish, and the observations were that they were conversing only in Spanish, but that's not the only factor, that there was no indication that they had any affiliation with either of the football teams, keeping in mind that this was a high school championship game with lots of family people around, the record is clear on that, that they did not seem to be mingling with other persons. Why does it matter if they didn't have an affiliation with either team? Why isn't that a so what? Because, I mean, some people could go to high school basketball games to see the content. Judge, I think it's because there were six men that appeared to be, to the Border Patrol agents, appeared to be consistent with the working crews that were in the area, and that this was not perhaps a group of six fathers, if you will, from Billings, Montana, or from Great Falls, Montana, but rather from their experience, which is explained in the record, appeared to be a work crew. Excuse me, but it seems to me the fact that they're a work crew helps to explain why they're at a game without any allegiance to a particular team. I mean, they're a work crew in the area. They're probably not based permanently in the area, and we don't have any work to do right now. Let's go to a high school football game. I mean, it's very puzzling to me that that somehow turns them into suspicious people. And, Your Honor, that's a very good point. However, that's not the only point. The point is that these are all factors that are contained in the record and that are actually relied upon in terms of the judgment of the Border Patrol agent in moving forward towards this group. Again, outside the game, in a discreet way, it was a casual walking up to the vehicle. It was an un-uniformed, off-duty Border Patrol agent who walks up to them and says, hey, guys, how's it going, speaks to them in English first. And then they responded they appeared to not understand English, and then he explained or offered that he was from immigration and then asked them what their immigration status was and so on. And I would point out that the entire encounter. Ms. Horstman, before the officer spoke to them in English and found out that they didn't understand English, had he already stopped the car? At what point did he turn the car engine off? He turned the car engine off. According to the record, the agent, the Border Patrol agent, turned the record off after he determined that these were aliens and that at least one of them didn't have papers. He had asked them, where are you from? And they replied, the different countries. He asked the driver specifically when he didn't answer, where are you from? He said, Mexico. Do you have papers to be valid in the United States? The others were gathering the papers. The driver did nothing. He reached in and turned off the truck at that time. I would point out, too, that he turned off the car engine after the driver indicated he was from Mexico and didn't have papers. That's what the record says, Judge. Well, then your position is there was no seizure until the defendant told the officer that he was from Mexico and without papers. Is that correct? Right. That's correct. Did he actually say he didn't have papers or did he just say, I'm from Mexico, and unlike the others, he wasn't producing papers? I don't know if that makes a difference or not, but what does the record show? Your Honor, I believe the record is clear that the question had been presented to the people in the vehicle as to nationality. The responses came from the others but not from him. When he did ask him specifically about his nationality, he said, I'm from Mexico. The next question was, where are your documents? That's the next question. And whether he said exactly at that point before the engine was turned off for whether the lack of documents being produced, that was the reason why the FBI agent was concerned because as this encounter occurred, the request was, where are your documents? A very common question, where are your documents? So they're reaching in their pockets and reaching around to get the documents, and the FBI agent, who's not familiar with this process, said, whoa, whoa, whoa, let me see your hands, because he has six men in a vehicle that is a large Ford F-150, very large vehicle that is a work vehicle that belongs to Polaris Industries, and he can't see around where these gentlemen are to be able to know what's going on. Now, in the shuffle, there was the production of papers, but the defendant produced none, and it was during that time frame, and I can't give you a second-by-second delineation of when it all occurred, but it was during that time frame that the paperwork was being dug out, that the vehicle was turned off. Okay. What significance is there, if any, of the fact that at the game, when Border Patrol observed the men, they spoke only in a foreign language, only in Spanish. Does that have any significance or great significance or something in between? I would say it's of minor significance. It's because just as the court pointed out during the questioning of Mr. Ness, it is just one of the factors under the Ponce case, and that we are to look at all the factors in a totality of circumstances, not divide and conquer any one particular factor, and I believe that that's what the appellant is trying to do here is to divide and conquer the mere fact of having spoken Spanish or the mere fact of Hispanic appearance. That is not to be done because we are to look at the totality. So I would say it is a factor but not the primary factor, Your Honor. I would also point out that because of the collective experience of the agents from that particular area, that those collective experiences explain why they had a sense that this was a work crew, why this particular company, who they knew, tended to have aliens working on the crew, and that from time to time, one or more of the work crews have illegal aliens on them. Pardon me. Is there any evidence in the record that this company, Polaris, had aliens working in work crews? And if so, please point that out to me. The answer is yes, and if you give me just one moment, I'll get to the actual citation. We'll add a few minutes to your time because we're adding it to the appellant's time loss. Thank you. Which agent testified as to that or what proof was used? Specifically, this company was known to the collective experience of the agents to have used aliens who were illegals or, as some people call them, undocumented. It was Agent Call, K-A-U-L, and I'm trying to find that specific reference to… That's all right. I don't want to take a lot of your time. Agent Call. Anybody else? We'll check it. Your Honor, if I may, at the excerpt of record, page 49, which includes pages 10 through 13 of the actual hearing transcript, specifically at page 12 of the hearing transcript on excerpt of record, page 49, the question was presented to the agent, and from your experience as a Border Patrol agent in Havre sector, what has been your experience with regard to work crews and aliens? And he said, We've encountered numerous work crews in Havre that employ illegal aliens, in some cases all illegal aliens, and others one or two illegal aliens in the group of workers. And as I'm scanning through here, I'm trying to find the actual reference to the employment by the company of Polaris. Well, we can review the record on that point. You think it was Agent Cower? Is that correct? I believe it was Agent Call. Call. K-A-U-L. If not, then Agent Bischoff, B-I-S-C-H-O-A-X. All right. We'll take a look at both of those. Thank you. And with regard to the remaining factors, I would again point out that the district court listened to the testimonies of three federal agents. The deposition testimonies of the deported aliens, we actually did material witness depositions of them, and also the testimony of the defendant. So there was a lot of information before the court, and the United States would ask this court to give reference to their clients in the district court. Thank you very much. Thank you. Okay, Mr. Metz. Thank you. There was a question asked whether when the vehicle was turned off, was it turned off before or after Agent Call asked for Mr. Manzo-Gerato's papers. And I think that there's at least some dispute in the record on that point. As I recall, I think Agent Call stated that he didn't turn off the car until after he was given the papers. Mr. Manzo-Gerato, and I didn't have time to check it, but I think at least some of the other people in the car testified that he turned off the car almost immediately upon his approach when he came up and told them that he was with Border Patrol, and he reached in and turned off the vehicle. I suppose we have no finding on that because the district court assumed that, I guess, for purposes of decision that they stopped. I think so, yes. I think it's pretty clear. And I guess I would just run through real quickly maybe again this whole thing. Well, let me go back to Judge Canby's question. It seems like everyone, the district court and the government, concedes an argument that there was a seizure, maybe at the point the car is turned off. But as to whether there's reasonable suspicion to justify the seizure, the timing of when that's turned off could be significant. And so the district court didn't – did the district court make a specific finding on whether the car was turned off before or after the appellant said he was from Mexico and didn't produce papers? I don't think it did. The district court proceeded on the assumption that everything that the police did from the very beginning to the end was reasonable and was reasonable. But wait a minute. The court said at page 86 of the transcript, and taking the totality of the circumstances into account, I do not find that the time taken to interview these individuals or the events which transpired involving this defendant amounted to an arrest until the time that the defendant acknowledged that he was from Mexico and had no papers. Now, are we to imply that the events which transpired include the turning off of the car or not? In other words, the car wasn't turned off until he acknowledged he was from Mexico and had no papers? Or is that a leap of faith rather than a deduction? Just taking a minute to – I think certainly the court doesn't state specifically anything about turning off the car. And he uses the term arrest, which may somewhat of a term of art, somewhat different from whether or not there was a Terry stop sort of event here. So, I mean, the court, from that language, seems ambiguous. As I hear it, Judge Baird, it could mean there wasn't a – he's not addressing whether there was a seizure before the admission of having no papers was made. He's saying that's when the arrest occurred. Right. That's what I think the court is possibly saying here. It's kind of hard to tell if he's referring to a formal arrest or a seizure. Thank you. Thank you very much. Let me ask you to address one question here. I'm sorry. It's just on my mind. I'd like to hear your perspective just on the significance of the factor that the men are observed speaking exclusively in Spanish at the game. I think that that's a factor that goes strictly towards race or national origin. And I don't think the fact that they're speaking solely Spanish adds anything to an analysis on whether or not they were involved in any sort of illegal activity. But didn't Brignone-Ponce, didn't the Supreme Court say that ancestry could be considered as one factor? I think it could, but I think you also need to sort of look at the other facts involved in Brignone-Ponce. And that is, what happened there, it occurred on, as I recall, a highway that was typically involved in illegal alien smuggling close to the Mexican border. Here we're talking about a football game. I understand that. But the Supreme Court, when they make rulings like in Brignone-Ponce, and it's been followed for decades, they haven't overruled it. They lay out a set of rules sometimes of what can be considered. It seemed to me that they were making a clear holding that ancestry could be considered as one factor, but not as a sole factor. I would agree with that. And the importance to place on that factor, I'm not completely sure, except I would look at decisions from this Court later on that talk about using race as an egregious violation. In those cases, I think that it is most thorough. Okay. Thank you. Okay. We thank both counsel for the argument. And the case of United States v. Mondeo-Toronto shall be submitted. We turn to the next case on our calendar, which is the second. Thank you, Ms. Horst.
judges: Canby, Gould, Bea